**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X     Case No.:
JUDITH BERNABE-SOBOL,

                                      Plaintiff,            **COMPLAINT**

            -against-
                                                           **JURY TRIAL DEMANDED**

SOLVAY SPECIALITY POLYMERS USA LLC,
SHAWN SHORROCK; ANGELA REGANALL; and
KERI WILLIAMS

                                      Defendants.

-------------------------------------------------------------------X

      Plaintiff Judith Bernabe-Sobol, by her attorneys, Filippatos PLLC, hereby alleges against

Defendants Solvay Specialty Polymers USA LLC ("Solvay" or the "Company"), Shawn Shorrock,

Angela Reganall, and Keri Williams (together, the "Individual Defendants") as follows:

## NATURE OF THE CASE

      1.    Judith Bernabe-Sobol, a former dedicated Account Manager at Defendant Solvay,

is a courageous Filipino woman who was incessantly subjected at her workplace to rampant

discrimination, a hostile work environment, and retaliation following four years of otherwise

excellent performance.  Ms. Bernabe-Sobol was, tragically, viewed by her employer as "less than"

solely because of her race (Asian) and national origin (Filipino).

      2.    Plaintiff was repeatedly questioned non-stop about what country she was from,

whether she was working under a work visa, and how long she had lived in the United States.

Plaintiff was even insultingly told to take a "Crouching Tiger" approach by a white male coworker.

      3.    The discrimination and racial hostility even bled into Plaintiff's ability to perform

her job and succeed at Solvay. Indeed, not only was she the only Asian woman at the Company,

but she just happened to be Solvay's ***sole employee who did not receive any existing accounts*** to

manage and grow. Even more alarming, Plaintiff's white manager told her at their very first meeting together that, "I don't like you people," referring to Filipinos.

4.      As a result of Defendants' unlawful conduct, Plaintiff hereby brings this action to obtain redress from Defendants for violating her civil rights under Title VII of the Civil Rights Act of 1964, 42 USC §§ 2000e *et seq.*, ("Title VII"); Section 1981 of the Civil Rights Act of 1866, 42 USC § 1981 ("§ 1981"); the New York State Human Rights Law, New York State Executive Law, §§ 296 *et seq.* ("NYSHRL"); and the New York City Human Rights Law, Administrative Code §§ 8-107, *et seq.* ("NYCHRL").

## PARTIES, JURISDICTION, VENUE, AND ADMINISTRATIVE PREREQUISITES

5.      At all times relevant hereto, Plaintiff was and is a resident of the State of New York, County of Richmond.

6.      At all times relevant hereto, Plaintiff was and is a Filipino woman.

7.      At all times relevant hereto, Plaintiff was an employee of Solvay working remotely from the State of New York, County of Richmond, with the full knowledge and consent of Solvay.

8.      At all times material, Solvay was and is a limited liability company maintaining its principal place of business at 4500 McGinnis Ferry Rd, Alpharetta, GA 30005.

8.      Upon information and belief, Solvay employs approximately 1000 individuals on a full-time or full-time equivalent basis and thus is subject to all statutes upon which Plaintiff is proceeding herein.

9.      Upon information and belief, at all times relevant hereto, Defendant Shawn Shorrock was and is an individual residing in the State of Georgia, as well was an employee of Solvay, holding a position of "Sales Director, Americas – Healthcare, Consumer Goods, Construction and Environment," and had the authority to hire, terminate, and affect the terms and

2

conditions of Plaintiff's employment or to otherwise influence the decision making regarding same.

10.    Upon information and belief, at all times relevant hereto, Defendant Angela Reganall was and is an individual residing in the State of Georgia, as well as an employee of Solvay, holding the position of "Regional HR Manager Americas," and had the authority to hire, terminate, and affect the terms and conditions of Plaintiff's employment or to otherwise influence the decision making regarding same.

11.    Upon information and belief, at all times relevant hereto, Defendant Keri Williams was and is an individual residing in the State of Georgia, as well was an employee of Solvay, holding the position of "Senior HR Business Partner/Site HR Manager," and had the authority to hire, terminate, and affect the terms and conditions of Plaintiff's employment or to otherwise influence the decision making regarding same

12.    This Court has subject matter jurisdiction over this matter pursuant to 28 USC §1331.

13.    This Court has supplemental jurisdiction over the claims that Plaintiff has brought under state law pursuant to 28 USC § 1367.

14.    Venue is proper in this district, pursuant to 28 USC §1391(b)(2), as a substantial part of the acts complained of occurred therein.

15.    By: (a) filing a Charge of Discrimination with Equal Employment Opportunity Commission ("EEOC"); (b) receiving a Notice of Right to Sue from EEOC on May 5, 2023; and (c) commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC, Plaintiff has satisfied all procedural prerequisites for the commencement of the instant action.

## FACTUAL ALLEGATIONS

### A.  Plaintiff Achieves Early Success at Solvay in the Novecare Unit

12.     In or about February 2016, Solvay hired Plaintiff as a Key Account Manager in the Novecare unit ("Novecare").

13.     Solvay hired Plaintiff to rebuild and grow Solvay's business relationship with a multinational consumer goods corporation which, at the time, was not on the best of terms with Solvay, and to provide administrative duties in sales. In light of Plaintiff 's impressive sales expertise and potential, Plaintiff was entrusted with a substantial portfolio that aligned with her capabilities.

14.     Plaintiff achieved early success at Solvay. Within her first year, she was able to regain approximately $1 million in previously lost revenue from the multinational consumer goods corporation's account, which was generating approximately $6 million in annual revenue.

15.     Over the course of the following six years, Plaintiff wholeheartedly committed herself to both professional and personal development, consistently improving her sales expertise. With unwavering determination, Plaintiff navigated and addressed a wide range of sales and management issues, setting herself apart as an outstanding employee.

16.     In 2016, 2017, and 2018, Plaintiff received a "high performer" rating on her annual reviews and was recognized as one of Novecare's "best hunters." She was even invited to Solvay's first company-wide "Talent Day" in 2017.

17.     In 2019, prior to joining the Specialty Polymers Unit ("SSP"), Plaintiff highlighted the value she brought to Solvay by closing what may still be the largest United States multi-year contract in Novecare's history.

4

**B.**     **Plaintiff was Promoted to a New Position within the Specialty Polymers Unit but Was Immediately Subjected to Disparaging and Discriminatory Treatment**

18.     Following Plaintiff's outstanding performance between 2016-2018, Plaintiff, in February 2019, applied to and moved to SSP as a Sales Development Manager for Consumer & Construction ("SDM").

19.     Almost from the first day, Plaintiff realized that matters would be different for her here than at Novecare.

20.     As early as April 2019, Plaintiff was singled out and questioned by coworkers on her ethnic background. On several occasions coworkers inquired about Plaintiff's United States citizenship status, whether Plaintiff is an immigrant, if Plaintiff immigrated "recently," and if Solvay sponsored Plaintiff's "work visa."

21.     The questions Plaintiff was faced with included: "How long have you been in the US for?"; "Have you always lived in New York or are you originally from someplace else?"; "Did you come to the US on your own?"; "Is your family originally from New York?"; and "Have you recently moved from the Philippines."

22.     Plaintiff was repeatedly reminded that she was of a different race and national origin than her coworkers and was not a part of the team. Plaintiff's managers were keenly aware of this fact yet did nothing to address it.

23.     This pattern of questioning Plaintiff's national origin continued through June and July of 2019, as a coworker named Pat Neel, who had observed Plaintiff's accent and appearance, asked Plaintiff if she was a "native New Yorker" or "somewhere else?"

24.     Plaintiff accepted her new position in February 2019, but due to the time it took to transition her Novecare accounts to her colleagues, Plaintiff did not start working for SSP until June 2019.

5

25.     Upon starting the new position, Plaintiff was given no existing sales contacts or accounts, which is customary for an SDM at SSP. Plaintiff instead received a list of prospective accounts with no prior or existing relationship, or with a negative relationship history with Solvay in the United States. This in turn required Plaintiff, **unlike any other SDM in the group**, to devote 100% of her time to developing and rehabilitating prospective accounts. In contrast, her peers were routinely given a split of both existing and prospective accounts.

26.     This discrepancy in prospective and existing accounts put Plaintiff at a disadvantage as she was given less support and fewer resources than existing sales managers to whom she was being directly compared.

27.     In 2021, despite being put at a disadvantage from the start of her role as SDM, Plaintiff received a "solid" contributor mark on her first annual review, reflecting Plaintiff's ability to deliver projects on time and grow her "development pool" (current prospects/ likelihood to close accounts).

28.     In 2020, the COVID-19 pandemic promoted a company-wide reorganization requiring all employees to use vacation days, endure a furlough period, and take an 8% pay cut. Additionally, a number of positions were eliminated, causing the remaining work responsibilities to be redistributed.

29.     During this period of reorganization, Plaintiff's group (Consumer and Construction) was merged with Solvay's Health Care and Environment Market groups forming the Health Care, Environment, Consumer & Construction Market group ("HECC"). This merger forced Ms. Bernabe, along with other SDMs, to interview for a newly created "Key Account Manager" ("KAM ") position. Several previous managers who did not meet the new requirements for KAM were terminated following the interview process.

6

30.     Plaintiff became a KAM in Summer 2020, with an annual salary of $150,000.

31.     Despite Plaintiff's outstanding work performance and value brought to Solvay, Plaintiff was anything but safe upon being assigned a new manager, Defendant Shorrock. Rather, during this period of transition, a notable shift in dynamics occurred.

32.     The assignment of Plaintiff's new manager marked a turning point in which the atmosphere within the department took an even more hostile and discriminatory turn for Plaintiff.

**C.     Plaintiff Suffers Racial and National Origin Discrimination With Respect to the Terms and Conditions of Her Employment Right as Defendant Shorrock is Assigned as Her New Manager; Her Complaints Fall on Deaf Ears**

33.     In July 2020, when Defendant Shorrock became Plaintiff's new manager, Plaintiff's experience working at Solvay got dramatically worse, and she almost immediately became *persona non grata.*

34.     In Plaintiff's first (virtual) meeting with Defendant Shorrock, on July 9, 2020, Defendant Shorrock introduced herself and immediately asked, "What is your background? I mean, is your family, are you, from New York?" Plaintiff responded, "I am Filipino, and had moved here after college."

35.     At this moment Plaintiff noticed a change in Defendant Sharrock's attitude and body language, which became visibly colder. She crossed her arms and turned her body away from Plaintiff, making her feel insecure and anxious.

36.     Defendant Shorrock followed up by saying something along the lines of **"I don't like you people"** or **"I don't like your people."** Plaintiff was taken aback by what she was hearing, and was shocked and unsure how to respond. Plaintiff steadied herself, attempting to continue the conversation professionally.

37.     Subsequent meetings and interactions with Defendant Shorrock only confirmed Plaintiff's fears as Defendant Shorrock made no secret of her bias against Plaintiff. Plaintiff was the only Filipino in the group, and Defendant Shorrock went out of her way to favor everyone over Plaintiff. Plaintiff was not provided the same opportunities as everybody else, and when she complained, her pleas fell on deaf ears.

38.     Only a week after Defendant Shorrock's outrageous remark, on July 16, 2020, she sent Plaintiff a document reflecting her allocation of accounts among members of the group. **Plaintiff was the only KAM who was given 100% prospective accounts and no existing accounts.**

39.     Plaintiff requested information from Defendant Shorrock regarding the company-wide policy that all KAM must maintain a balanced workload consisting of a portfolio of existing and prospective accounts but was brushed off and ignored. This request frustrated Defendant Shorrock as she responded: "I am sure you haven't had this experience before, but each Manager has the freedom to decide who would be given what. I decide which one of you receives prospective accounts and which one gets key accounts."

40.     When Plaintiff asked why she was the only KAM given 100% prospective accounts and zero sales credits, she was again completely ignored.

41.     Plaintiff was also stripped of all the prospective accounts she had previously worked on before Defendant Shorrock became her manager. When Plaintiff expressed concerns about losing her prospective accounts, Defendant Shorrock merely told Plaintiff to transfer all her significant pending opportunities to another KAM named Dane Waund, a Caucasian man, and the rest to SSP's "inside sales" team. One of the opportunities Plaintiff had in the works was a $2

million per year revenue opportunity with a global packaging company that was close to being finalized.

42.    A few days later, on July 21, 2020, Defendant Shorrock belittled and embarrassed Plaintiff by asking her to "rank" her top ten accounts by revenue. This was not a genuine inquiry, as Defendant Shorrock knew that Plaintiff had no accounts generating revenue.

43.    Defendant Shorrock used this seemingly standard question to remind Plaintiff she would never meet her sales goals with Defendant Shorrock as her Manager.

44.    This was also done to denigrate and push Plaintiff out by reminding her that she would never be able to have the position she thought she was signing up for so long as Defendant Shorrock was her manager and would be better off quitting.

45.    To make matters worse, Plaintiff again attempted to voice her concerns regarding her lack of existing accounts, to no avail.

46.    Specifically, on July 21, 2020, Plaintiff requested to retain a prospective account with around $3 million in revenue potential. However, Defendant Shorrock indicated that she was "leaning toward" assigning the account either to Mr. Waund or another KAM named Pete Siruas – two Caucasian males who already had several existing, high-value accounts.

47.    Then on July 28, 2020, Plaintiff contacted Art Tigera, a Sales Director for Solvay, to ask why she had not been assigned any existing accounts. Mr. Tigera indicated that he had no knowledge of Plaintiff's lack of existing accounts and asked Plaintiff whether she had expressed concern to Defendant Shorrock.

48.    Plaintiff explained that she had repeatedly raised this issue with Defendant Shorrock to no avail. Mr. Tigera then told Plaintiff he would talk with Defendant Shorrock regarding Plaintiff's assignment of existing accounts.

49.     In other words, the conversation with Mr. Tigera was totally fruitless.

50.     On August 4, 2020, Plaintiff had a "catch up" call with her assigned mentor, Defendant Axelrad. During this conversation, Plaintiff again expressed her concern about being the only SDM-turned-KAM who was assigned solely prospective accounts in light of SSP's post-reorganization policy requiring a balance between prospective and existing accounts. Yet again, these concerns fell on deaf ears.

51.     Soon thereafter, Plaintiff took part in a mid-year review which was conducted by Plaintiff's previous manager, Walter Geerts. During the review, Defendant Shorrock was present even though the review was only covering the period before Defendant Shorrock became Plaintiff's manager.

52.     After the meeting, Defendant Shorrock asked Plaintiff to set account and balance goals for the year. Plaintiff responded by asking if there were any templates or formatting guidelines that she had to follow, as she was aware that templates had been provided to Account Managers and SDMs. Unsurprisingly, Defendant Shorrock stated that she "did not" have any guidelines.

53.     Additionally, Defendant Shorrock instructed Plaintiff to prepare a Key Account Plan for a prospective account by the end of September 2020. In contrast, all of Plaintiff's peers were afforded an additional month to do so (until the end of October), again making it more difficult for Plaintiff to succeed.

54.     Then on September 28, 2020, after Defendant Shorrock directed Plaintiff to reach out to a colleague of hers, Marketing Manager Guru Prasad Sivakumar, for support creating a presentation to grow Plaintiff's development pool, Defendant Shorrock impeded her own directive by sending a private message to Mr. Sivakumar wherein she told him that what Plaintiff would be

requesting him to help with was outside the scope of employment.  Notably, Plaintiff became aware in October 2020 that other KAMs – who were not Filipino or Asian – were provided support from Mr. Sivakumar for similar presentations.

55.     Further, Defendant Shorrock regularly attended, participated, and assisted in prospective customer meetings with Plaintiff's colleagues but did not do so for Plaintiff. Plaintiff was forced to conduct all of her day-to-day business with no managerial support.

**D.     Plaintiff is Routinely Humiliated and Discriminated Against by Defendant Shorrock**

56.     Around the beginning of September 2020, Defendant Shorrock began to target, ostracize, and embarrass Plaintiff publicly during group meetings. For example, Defendant Shorrock would intentionally greet everyone attending the meeting by name apart from Plaintiff, even when Plaintiff's name was explicitly included in the agenda.

57.     To make matters worse, Defendant Shorrock avoided speaking with Plaintiff at all costs. Defendant Shorrock would routinely cancel or reschedule weekly meetings at the last minute. Furthermore, on the rare occasions in which Defendant Shorrock did not cancel or reschedule a weekly meeting, Defendant Shorrock negatively compared Plaintiff's work product and work ethic to that of her white coworkers, stating that Plaintiff did not have the fortitude or the knowledge base to do her job effectively. In these meetings, which were often cut short, Defendant Shorrock often made remarks about other employees' work, implying that Plaintiff did not have the "tools" or best practices to do her job effectively.

58.     Another instance of demeaning and disrespectful behavior occurred on September 24, 2020, during a virtual group meeting. Not only did Defendant Shorrock fail to notify Plaintiff about the 8 a.m. meeting until late in the day prior, but during the meeting, Defendant Shorrock again made a point to greet and address all participants by name except for Plaintiff.

59.     Then, Defendant Shorrock instructed Plaintiff to be the first to provide an update to the group about one of her prospective accounts. To Plaintiff's shock, as soon as she finished providing the update, Defendant Shorrock humiliatingly said to her in front of the group: "there is no need for you to stay on the call since you only handle [that account]."

60.     Not only was Plaintiff mortified and embarrassed in front of her peers, but she was the only employee asked to leave the meeting.

61.     Later that day, September 28, 2020, Plaintiff was called into a meeting with the HECC team to be introduced to the new Vice President of HECC, Jesal Chopra. During this meeting, Defendant Shorrock instructed the group to introduce themselves in alphabetical order. Plaintiff would be first but before she introduced herself, Defendant Shorrock said nothing to introduce her, in contrast to how she introduced each of the other employees by providing positive remarks and even a brief anecdote or personal insight about that employee.

62.     Defendant Shorrock also routinely humiliated Plaintiff in front of coworkers by making belittling comments and by claiming that Plaintiff needed to improve her performance. Plaintiff later discovered, in early October 2020, that Defendant Shorrock consistently spread falsehoods about Plaintiff to other Solvay managers, including Mark Saltzman and Kristy Wynn, to tarnish her reputation and eviscerating her chances of having a long and fulfilling career at Solvay.

**E.     Plaintiff's Complaints about the Discrimination Are Casually Cast Aside by Management**

63.     Fed up with the discriminatory treatment she was constantly enduring, Plaintiff contacted Brian Baleno, the former Head of Marketing & Global Business Development, and let him know that she was at her breaking point and did not know what to do. Mr. Baleno suggested that Plaintiff schedule a meeting with her assigned Human Resources representative, Defendant

Reganall, regarding the unequal distribution of accounts and lack of support she received at Solvay. Plaintiff sent a message to Defendant Reganall later that day requesting a confidential meeting.

64.     The two spoke on the phone on October 22, 2020. Mr. Baleno was also on the call during which Plaintiff notified Defendant Reganall about the negative treatment she had been receiving from Defendant Shorrock and indicated that this was not a sustainable working environment. Plaintiff also mentioned how she was routinely treated differently than any other KAM and experienced microaggressions and requested to be moved to another group.

65.     Defendant Reganall showed no compassion or sensitivity toward Plaintiff's plight. Defendant Reganall's only suggestion was that she and Plaintiff have a three-way conference call with Defendant Shorrock, which Plaintiff naturally declined.

66.     Rather than address Plaintiff's complaints, Defendant Reganall was more concerned with – and as she admitted – Defendant Shorrock's "development as a manager." When Plaintiff declined to have the three-way call, Defendant Reganall asked her what she planned to do to gauge whether Plaintiff would file a formal discrimination complaint.

67.     The meeting concluded with Defendant Reganall claiming that information was "new" to her, that she was going on vacation the next day, and that she would "think" about the situation and "touch base" when she returned from vacation. Discouragingly, Defendant Reganall added that any resolution would not come "overnight" but in the first quarter of 2021 at the earliest – three long months away.

68.     Contrary to Defendant Reganall's assurances during the October 22, 2020, phone call, Plaintiff did not receive any follow-up from Defendant Reganall when she returned from vacation. Plaintiff contacted Defendant Reganall on November 12, 2020, to schedule a follow-up

call, but during the call, Defendant Reganall made clear that she had discussed her conversation with Plaintiff with Defendant Shorrock, even though Plaintiff had requested that these discussions be kept confidential.

69.    On November 16, 2020, Defendant Reganall wrote to Plaintiff stating that she did not understand Plaintiff's concerns, and reiterated her suggestion that Plaintiff speak to Defendant Shorrock and try to sort out their disagreements. In other words, Defendant Reganall casually dismissed Plaintiff's complaint, and her "solution" was to have Plaintiff restate her concerns to the person she was bullied, targeted, and humiliated by.

70.    On November 30, 2020, Plaintiff again took a leap of faith and complained to Defendant Shorrock, attempting to turn a new leaf. Defendant Shorrock responded by attacking Plaintiff's performance by claiming that Plaintiff had "zero developments" in her 18 months, despite fully knowing that she had taken away Plaintiff's previous developments from Plaintiff's hands against Plaintiff's objections. When Plaintiff noted this to Defendant Shorrock, Defendant Shorrock promptly excused herself from the conversation without offering any conclusion.

71.    On December 2, 2020, Plaintiff contacted Defendant Reganall to find out what the next steps concerning her conversation with Defendant Shorrock would be. Unsurprisingly, Plaintiff received no response.

72.    Plaintiff followed up with Defendant Reganall approximately one week later, on or around December 10, 2020. This time, Defendant Reganall again told Plaintiff that she was going on vacation the following week but would "touch base" during the week of December 21, 2020. Just like the first time Defendant Reganall inexplicably failed to follow up with Plaintiff.

73.    Notably, during Plaintiff's time with Solvay, she became aware of several instances where the HR department promptly resolved any issues that white employees, particularly males,

had with their managers. These employees were provided with new opportunities (including, in one instance, a new position created solely to remedy the employee's complaint), moved to other groups, or given a similar positive solution.

74.     A formidable example occurred with Ms. Axelrad, who, after complaining to HR about her former manager, was provided with a new position as Customer Technical Development Manager and moved to a different group.

**F.    Despite Plaintiff's Complaints about the Discrimination, Defendant Shorrock's Conduct Continues and Plaintiff is Retaliated Against for Her Protected Activity**

75.     Plaintiff's protected complaints to Mr. Baleno and Defendant Reganall did not prevent or deter Defendant Shorrock from continuing her discriminatory campaign against Plaintiff. Rather, the behavior only worsened.

76.     For instance, at a November 3, 2020, meeting, Plaintiff was once again ordered to present first, was not even given a brief introduction before she spoke, and was asked to leave the meeting immediately after she completed her presentation. Defendant Shorrock went out of her way to make Plaintiff feel inadequate and ill-prepared in front of her peers.

77.     At the next HECC team meeting, on November 16, 2020, Defendant Shorrock doubled down on her efforts to attack Plaintiff by publicly blaming her for a lost business opportunity for which she was not responsible. Yet, Defendant Shorrock completely disregarded the fact that another KAM, Mr. Sirusas, was responsible for losing an approximately $2 million business.

78.     On December 14, 2020, Plaintiff received her first review from Defendant Shorrock. During the review, Plaintiff highlighted her contributions to an 11% increase in sales revenue and the 21 technical webinars she conducted – an impressive number by any standard. In response, Defendant Shorrock gave no feedback and comments, and the meeting hardly lasted a

half an hour. Indeed, unlike all of Plaintiff's previous reviews at Solvay, at no point did her manager, Defendant Shorrock, inquire or discuss what Plaintiff wanted to do to further advance her career, clearly demonstrating that she had no interest in seeing Plaintiff succeed.

79.    On January 4, 2021, Defendant Shorrock requested Plaintiff's 2021 objectives, even though Plaintiff had already completed and put them on Solvay's official review form and pointed it out to Defendant Shorrock. Regardless, Defendant Shorrock told Plaintiff to get the objectives to her by the end of the day. Plaintiff later learned that none of her colleagues had received the same or even a similar request.

80.    To the contrary, Plaintiff's colleagues had each been told they did not need to respond until the middle of the month – more than ten days later. Plaintiff was again treated less favorably than her peers. Nevertheless, Plaintiff provided Defendant Shorrock with the requested information later that day.

81.    Then on January 22, 2021, Defendant Shorrock issued Plaintiff an unwarranted negative performance review. Defendant Shorrock rated Plaintiff a "2-"(i.e., below a "2"), indicating that Plaintiff's contribution – for the first time in her entire tenure at Solvay – was not merely "limited" but below minimal.

82.    Plaintiff asked Defendant Shorrock how it was possible that she could be rated so poorly when she over-delivered on her deliverables as previously agreed upon, including exceeding her sales goal by 11% and quintupling the target set for technical webinars. In typical fashion, Defendant Shorrock deflected the question by stating: "It wasn't about that at all," offering no further explanation.

83.    Additionally, Defendant Shorrock informed Plaintiff that her request to transfer "won't be happening" because she simply would not permit it.

84.     When Plaintiff again asked why, Defendant Shorrock told Plaintiff that she was "lucky" to have received the "limited" rating rather than be placed on a Performance Improvement Plan ("PIP"). Defendant Shorrock then pressured Plaintiff to acknowledge that all her negative feedback was valid even though they both knew that Plaintiff had outperformed all her objective measurements, making clear the rating was entirely based on her personal bias and in retaliation for Plaintiff's complaints.

85.     In retrospect, Plaintiff realized that, even though Solvay was an international company, everyone in leadership and HR with whom she made contact was Caucasian. Plaintiff never imagined being discriminated against at Solvay and SSP, even if she happened to be the only Filipino and Asian woman.

86.     Although Plaintiff always understood bias was present in the workplace, it had never affected her directly. Plaintiff never could have anticipated that she would be victimized to such an extent or by someone who would be so bold as to not even to care to hide her disgusting bigotry.

**G.    Plaintiff Alerts HR about Defendant Shorrock's Discriminatory and Retaliatory Conduct to No Avail**

87.     On February 4, 2021, after receiving her abysmal performance review, Plaintiff could no longer endure being constantly mistreated, demeaned, and retaliated against, and contacted Defendant Reganall to make clear that she had at no point ever been unprofessional toward Defendant Shorrock, yet, Defendant Shorrock had repeatedly fostered an incredibly aggressive and hostile work environment. Plaintiff told Defendant Reganall how Defendant Shorrock had targeted her and treated her less favorably than her colleagues because of her race and national origin.

88.    Plaintiff noted how she had five different managers prior to Defendant Shorrock and had never experienced discrimination from any of them. Additionally, Plaintiff stated that she felt Defendant Shorrock had retaliated against her by preventing her move to a different group after she brought multiple complaints to HR.

89.    Unfortunately, Defendant Reganall responded by continuing to defend Defendant Shorrock's conduct and again suggested merely that the three meet to discuss the situation. Plaintiff responded by requesting that a neutral party be present at the meeting as Defendant Reganall seemed inclined to defend Defendant Shorrock.

90.    Defendant Reganall recused herself from the matter and advised Plaintiff that she would transfer the case to a colleague, Defendant Williams, after Plaintiff implied that Defendant Reganall's friendship with Defendant Shorrock created an inequitable process.

91.    On February 9, 2021, Plaintiff received a call from Defendant Williams, who was now the HR representative handling her case.  Defendant Williams asked Plaintiff to painstakingly recount everything that had occurred between her and Defendant Shorrock. Plaintiff thoroughly explained the discriminatory and retaliatory behavior she had experienced and then reiterated her request to transfer, but by the end of the call, no progress had been made.

92.    To make matters worse, Defendant Williams also suggested having a three-way meeting with Defendant Shorrock. At this point, it became clear that Plaintiff would receive no assistance from HR. Feeling utterly frustrated and defeated, Plaintiff reluctantly agreed to participate in a three-way meeting.

93.    On February 12, 2021, the meeting between Plaintiff, Defendant Williams, and Defendant Shorrock took place. Defendant Williams claimed that she wanted to "clear the air" despite Plaintiff's numerous attempts to do so previously. During the conversation, Plaintiff

indicated that the damage caused by Defendant Shorrock's discriminatory behavior was significant and could not be undone. Plaintiff then raised her only remaining question – could Defendant Shorrock act professionally until Plaintiff was given the opportunity to transfer to another group?

94.    Before the meeting concluded, Defendant Shorrock interjected, stating that Plaintiff had taken things out of context and that what Plaintiff "perceived" as discriminatory behavior was fictious and did not exist in "reality."

95.    To add insult to injury, Defendant Shorrock then attempted to shift the blame onto Plaintiff by labeling her as paranoid and delusional, baselessly stating that: "[Plaintiff] does not view things through the same lens as others."

96.    Plaintiff listened quietly to Defendant Shorrock's rant - which went on for approximately five minutes – as she attacked and disparaged Plaintiff in front of Defendant Williams, including, as noted, indicating that Plaintiff was mentally deficient. At the time, Plaintiff was shocked at Defendant Shorrock's five-minute-long diatribe and did not believe adding gasoline to the fire would have been helpful or productive.

97.    Eventually, when Defendant Williams finally asked Plaintiff to respond, Plaintiff declined and excused herself from the meeting, stating: "You will be hearing from someone, or I will be in touch."

98.    Instead of coming to some sort of resolution such as arranging for Plaintiff to be transferred to another manager pursuant to Solvay's own Code of Conduct, HR placed Plaintiff directly in the line of her harasser, forcing her to recount the traumatic discrimination and retaliation she had experienced, and then justified that behavior to top it off.

99.    Later that same afternoon, Defendant Williams told Plaintiff that: "because the meeting ended abruptly," she wanted to share her conclusions. Defendant Williams proceeded to

say that she had completed her "investigation" and found no discriminatory or otherwise unlawful conduct.

100.    This disheartening but preordained result did not surprise Plaintiff but confirmed her notion that HR would not offer her any support or resolution but would choose to defend the very person who caused her incessant, hostile work environment.

101.    The next day, February 19, 2021, Plaintiff responded to Defendant Williams by noting how her previous five managers at Solvay never questioned her skills, performance, or mental state.

102.    Further, Plaintiff questioned the scope and extent of Defendant Williams' "investigation," particularly whether she had been thorough and inclusive (she had not been either).

103.    Plaintiff concluded by stating that she was confident Solvay would offer no professional growth moving forward and that it was essential for her to understand: a) if the below "limited contribution" rating (2- out of 5) she had received would limit her career at Solvay; and (b) if there was still an opportunity for her to transfer to another organization or group within Solvay.  Plaintiff was explicit that she wanted to pursue the latter with no involvement from Defendant Shorrock.

104.    Defendant Williams and Defendant Shorrock responded by telling Plaintiff that Defendant Williams would join her reoccurring one-on-one meetings with Defendant Shorrock but entirely ignored Plaintiff's questions.

**H.     Plaintiff's Complaints Continue to Fall on Deaf Ears, Along With the Onslaught of Discrimination and Retaliation Against Her, Culminating in Her Unlawful Termination**

105.    In clear retaliation for Plaintiff's complaints to HR, Defendants began to treat Plaintiff even worse than they had been. Defendant Shorrock's discriminatory behavior became so apparent that it was now being noticed by other employees, several of whom asked or simply expressed the view that something was "going on." Defendant Williams herself also engaged in retaliatory conduct.

106.    For example, on February 5, 2021, the day after Plaintiff's HR complaint, Defendant Shorrock took the opportunity to publicly criticize Plaintiff in front of her colleagues (including the Vice President) on her choice of presentation topics and presentation skills when Plaintiff briefly stepped out of a group meeting to speak with a customer.

107.    In doing so, Defendant Shorrock gave Plaintiff no opportunity to respond, defend, or explain her rationale in choosing certain topics to present.

108.    Then, in the first regularly scheduled meeting after February 19, 2021, Defendant Shorrock retaliatorily placed Plaintiff on a 30-day PIP even though she had told Plaintiff two weeks earlier that she would not put Plaintiff on a PIP.

109.    Defendant Shorrock and Defendant Williams then presented a written notice to Plaintiff that stated a pretextual basis for the PIP. It was undeniable that Defendant Shorrock put Plaintiff on a PIP because of the complaints of discrimination and retaliation. HR, in particular Defendant Williams, was complicit in placing Plaintiff on a PIP in retaliation for her protected complaints of discrimination and retaliation.

110.    Shortly thereafter, Plaintiff had a conversation with Ziad Haddad, Senior Vice President for Special Chemicals, who had acted as a mentor to Plaintiff after meeting her at Solvay's Talent Day in 2017.

111.    During this conversation, Plaintiff shared her PIP with Mr. Haddad to which he made a remark about both its length and "action items." Mr. Haddad has issued more than 30 PIPs in his career but mentioned he always provided 60 – 90 days to ensure that the goals and "action items" could be achieved.

112.    Additionally, Mr. Haddad affirmed that the "action items" must be reasonable and objectively determined. In contrast of course, Plaintiff's PIP outlined a 30-day timeline with entirely *subjective* goals.

113.    Plaintiff did not hide the fact that she had been placed on PIP. Subsequently, and without Plaintiff's solicitation, many of her customers and colleagues rose to her defense.

114.    Due to the outpouring of support, on February 23, 2021, Defendant Williams told Plaintiff that she believed that Plaintiff was improperly rallying support on a confidential matter and that her behavior was a distraction that was making her employment less viable.

115.    It was clear that Defendant Williams was purposefully trying to impede Plaintiff from invoking support and threateningly implied that her employment may be on the line if she did.

116.    Thereafter, Plaintiff engaged legal counsel who sent a letter to the President of Solvay Growth Initiative and Chief North America Officer, G. Michael Finelli, on February 25, 2021, asserting her claims of race, national origin, ethnicity, and alienage discrimination, and unlawful retaliation.

117.    Nevertheless, in 2022, in response to the letter and the subsequent EEOC charge, Solvay proclaimed that Plaintiff could not have been discriminated against because the Vice President of HECC was Indian. This was an absurd and ridiculous assertion to make and arguably racist on its face. The implication was insulting that because HECC has a Vice President who is Asian, albeit not even Filipino, other non-Asians could not have discriminated against Plaintiff.

118.    During Plaintiff's first PIP check-in with Defendant Williams and Defendant Shorrock, Plaintiff was not provided an agenda in advance nor given any direction as to how to prepare or what to expect. Nonetheless, Defendant Shorrock exploited this opportunity and criticized Plaintiff for not doing anything to improve her situation, though she failed to provide any details on how Plaintiff could improve.

119.    Interestingly, Defendant Shorrock acknowledged her concern that Plaintiff had shared the fact that she was placed on a PIP with customers and teammates and claimed that she and Defendant Williams were treating the matter as confidential. This was of course not true, as Defendant Shorrock had told a colleague that Plaintiff had been placed on a PIP.

120.    When Plaintiff spoke up, she was told that she was not listening or taking the matter seriously. Plaintiff was further notified that some unidentified colleagues had allegedly said that she was defensive and did not take feedback or coaching "tips" well (which were lies).

121.    Defendant Shorrock continued her discriminatory and retaliatory conduct and started rallying other people to create a hostile work environment for Plaintiff, in particular, a newly hired KAM named Hari Mangalapalli. Defendant Shorrock purposefully transferred prospective accounts in which Plaintiff made the most headway to Mr. Mangalapalli.

122.    On February 18, 2021, Mr. Mangalapalli contacted Plaintiff for what she thought would be an introductory call. He started by asking about her experience so far at SSP, and then proceeded to ask where Plaintiff was from.

123.    When Plaintiff stated, "Staten Island," he pressed again saying: "No, no, not where you live now; where are you originally from? What is your background, nationality?"

124.    When Plaintiff responded that she was Filipino, he asked an even more invasive question: "Were you born here or naturalized?" Plaintiff answered that she immigrated with her family after college, to which he responded, with a sense of superiority, that while his name might appear foreign, he was born in the U.S.

125.    He continued to pry relentlessly, asking when Plaintiff had moved to the U.S., whether she had gone to college here or in the Philippines, how long ago it had been, and how long ago she first arrived in the country. Only then did he ask a work-related question about Plaintiff's "development process" and why a particular account development effort had failed.

126.    At that point, Plaintiff had had enough of the beyond-intrusive questions, and asked Mr. Mangalapalli whether he was having the same conversation with anyone else on the team, to which he responded no.

127.    It was clear that Mr. Mangalapalli did not intend to speak to Plaintiff to better understand the Company's operations but to pry into her racial background and national origin.

128.    Thereafter, Mr. Mangalapalli began entrenching himself more deeply into Plaintiff's accounts. His tone and demeanor became increasingly condescending, acting as if Plaintiff was his subordinate rather than peer. Notably, he only acted this way with Plaintiff and not with anyone else in the group.

129.    For example, on March 3, 2021, the day before Plaintiff was scheduled to meet with an important customer, Plaintiff met with several colleagues to discuss challenges that might arise during the meeting. Instead of providing constructive feedback, Mr. Mangalapalli and another colleague, Neel Sheth, criticized Plaintiff's planned presentation, asking condescending questions about the meeting plan. Clearly, the two were acting this way because they thought Plaintiff was inept because she was not from the U.S. and was educated in the Philippines and not the U.S.

130.    When Plaintiff told Mr. Sirusas about this unpleasant experience, he commented that Plaintiff should "push back" against Mr. Mangalapalli and Mr. Sheth in a ***"crouching tiger" approach*** – referencing the critically acclaimed film, "Crouching Tiger, Hidden Dragon," starring an all-Asian cast.

131.    Plaintiff felt discouraged by the subtly racist remark and was, once again, reminded that her coworkers saw her merely as Asian first rather than another member of the team. Notably, Plaintiff is not even Chinese.

132.    Then on March 9, 2021, Plaintiff told Mr. Mangalapalli and Mr. Sheth that they needed to treat her with the same respect and cooperation as they did with others, and to correct their tone and approach with her which made her feel strong-armed. She also reminded them that she was their equal, and not their subordinate.

133.    Later that day, Defendant Williams sent Plaintiff an urgent check-in invite for the next day, March 10, 2021. Defendant Williams stated that she wanted to discuss only the PIP; yet, when they spoke, Defendant Williams immediately brought up the email Plaintiff had sent to Mr. Mangalapalli and Mr. Sheth in confidence.

134.    Defendant Williams claimed that she wanted to investigate the matters described in the email. Plaintiff had to tell her at least three times that she was neither willing nor prepared to

talk about this subject, which she had raised directly and in confidence with her peers. Notably, Defendant Williams was all too quick to investigate issues that *others* raised, yet displayed absolutely no urgency or interest in investigating any of Plaintiff's concerns.

135.    Moreover, Defendant Williams claimed that Plaintiff had purportedly not been providing her with data and information to substantiate that Plaintiff was "taking the PIP seriously." Notably, Plaintiff was never informed about what she should be furnishing. It quickly became apparent that this would become the pretextual reason for Plaintiff's unlawful ouster.

136.    That same evening, Plaintiff asked Defendant Shorrock what she needed to provide to Defendant Williams to comply with the PIP before the next check-in meeting which would be in two days. Inexplicably, Defendant Shorrock stalwartly refused to identify anything in particular that Plaintiff should prepare for the next check-in meeting, and instead repeatedly referenced the wholly subjective "action items" in the PIP. It was clear that Defendant Shorrock did not want Plaintiff to prepare anything, which would set her up to fail and formulate a pretextual basis to fire Plaintiff.

137.    Finally, on March 12, 2021, Plaintiff was fired during the PIP check-in meeting allegedly because of Plaintiff's "unprofessional behavior." Clearly, Plaintiff was unlawfully and retaliatorily terminated a mere month after engaging in protected activity. Not only was Plaintiff's termination based on her unduly brief PIP, but Solvay did not even wait until the PIP concluded to gin up some new, pretextual basis upon which to justify firing Plaintiff.

138.    Sadly, even after firing Plaintiff, Solvay continued to retaliate against her by denying payment of her earned 2020 bonus, which should have been at least $10,000 even factoring in Defendant Shorrock's discriminatory and retaliatory performance rating. More to the point, Solvay failed to pay Plaintiff for all her accrued but unused vacation time – which amounted

to a full five weeks of pay, totaling $14,423. To add just a bit more insult to injury, Solvay unlawfully and bizarrely deducted another $250 from Plaintiff's pay for use of a company vehicle.

## <u>FIRST CAUSE OF ACTION</u>
## DISCRIMINATION AND HOSTILE WORK ENVIRONMENT UNDER TITLE VII
### *Against Solvay Only*

85.    Plaintiff repeats and realleges each and every allegation in the above paragraphs of this complaint as if fully set forth herein.

86.    By the actions detailed above, among others, Solvay discriminated against Plaintiff in violation of Title VII by, *inter alia*, denying her the equal terms and conditions of employment because of race (Asian) and national origin (Filipino) and allowing Plaintiff to be subjected to discrimination and hostile work environment.

87.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages, including, but not limited to, economic and pecuniary losses (past and future) – such as income, salary, bonuses, and other compensation that her employment entailed, severe emotional, psychological, and physical stress, distress, anxiety, pain and suffering, the inability to enjoy life's pleasures, and other non-pecuniary losses and special damages.

88.    Accordingly, as a result of the unlawful conduct of Solvay set forth herein, Plaintiff has been damaged and is entitled to the maximum compensation available to her under this law, including, but not limited to, liquidated damages.

## SECOND CAUSE OF ACTION
## RETALIATION UNDER TITLE VII
### *Against Solvay Only*

89.     Plaintiff repeats and realleges each and every allegation in the above paragraphs

of this complaint as if fully set forth herein.

90.     By the actions detailed above, among others, Solvay has retaliated against

Plaintiff based on her protected activities in violation of Title VII, including by subjecting her to

baseless negative performance review, PIP, denying her the ability to transfer to a different group

within the Company, and by terminating Plaintiff's employment.

91.     As a result of the acts and conduct complained of herein, Plaintiff has suffered and

will continue to suffer damages, including, but not limited to, economic and pecuniary losses (past

and future) – such as income, salary, bonuses, and other compensation that her employment

entailed, severe emotional, psychological, and physical stress, distress, anxiety, pain and suffering,

the inability to enjoy life's pleasures, and other non-pecuniary losses and special damages.

92.     Accordingly, as a result of the unlawful conduct of Solvay set forth herein, Plaintiff

has been damaged and is entitled to the maximum compensation available to her under this law,

including, but not limited to, liquidated damages.

## THIRD CAUSE OF ACTION
## DISCRIMINATION AND HOSTILE WORK ENVIRONMENT UNDER SECTION 1981

93.     Plaintiff repeats and realleges each and every allegation made in the above

paragraphs in this complaint as if fully set forth herein.

94.     Pursuant to 42 USC §1981: "All persons within the jurisdiction of the United States

shall have the same right in every State and Territory to make and enforce contracts, to sue, be

parties, give evidence, and the full and equal benefit of all laws and proceedings for the security

of persons and property as is enjoyed by white citizens, and should all be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other."

95.    Defendants engaged in unlawful employment practices prohibited by 42 USC §1981 against Plaintiff by denying her the equal terms and conditions of employment, discriminating against her, and subjecting her to a hostile work environment because of her race (Asian) and national origin (Filipino).

96.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission, and other compensation that her employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

97.    Accordingly, as a result of the unlawful conduct of Defendants set forth herein, Plaintiff has been damaged and is entitled to the maximum compensation available to her under this law, including, but not limited to, liquidated damages.

## **FOURTH CAUSE OF ACTION**
### **RETALIATION UNDER SECTION 1981**

98.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs in this complaint as if fully set forth herein.

99.    As described above, Defendants retaliated and/or discriminated against Plaintiff for engaging in protected activities pursuant to 42 USC § 1981, including by subjecting her to baseless negative performance review, PIP, denying her the ability to transfer to a different group within the Company, and by terminating Plaintiff's employment.

100.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission, and other compensation that her employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

101.    Accordingly, as a result of the unlawful conduct of Defendants set forth herein, Plaintiff has been damaged and is entitled to the maximum compensation available to her under this law, including, but not limited to, liquidated damages.

**FIFTH CAUSE OF ACTION**
**DISCRIMINATION UNDER NYSHRL**

102.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs in this complaint as if fully set forth herein.

103.    New York Executive Law § 296 provides that:

1.  It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

104.    By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of the NYSHRL by, *inter alia*, denying her the equal terms and conditions of employment, discriminating against her, and subjecting her to a hostile work environment because of her race (Asian) and national origin (Filipino).

105.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past

and future) – such as income, salary, benefits, bonuses, commission, and other compensation that her employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

106.    Accordingly, as a result of the unlawful conduct of Defendants set forth herein, Plaintiff has been damaged and is entitled to the maximum compensation available to her under this law, including, but not limited to, liquidated damages.

**SIXTH CAUSE OF ACTION**
**RETALIATION UNDER NYSHRL**

107.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

108.    New York Executive Law § 296 provides that:

> 7.  It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.

109.    By the actions detailed above, among others, Defendants have retaliated against Plaintiff based on her protected activities in violation of the NYSHRL, including by subjecting her to baseless negative performance review, PIP, denying her the ability to transfer to a different group within the Company, and by terminating Plaintiff's employment.

110.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission, and other compensation that her employment entailed; severe emotional, psychological and physical stress, distress, anxiety,

pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

111.    Accordingly, as a result of the unlawful conduct of Defendants set forth herein, Plaintiff has been damaged and is entitled to the maximum compensation available to her under this law, including, but not limited to, liquidated damages.

## SEVENTH CAUSE OF ACTION
## AIDING AND ABETTING UNDER NYSHRL
### *Against Individual Defendants Only*

112.    Plaintiff hereby repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

113.    New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

114.    Individual Defendants engaged in an unlawful employment practice in violation of New York State Executive Law § 296(6) by aiding, abetting, inciting, compelling, and coercing the discriminatory conduct against Plaintiff.

115.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission, and other compensation that her employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

116.    Accordingly, as a result of the unlawful conduct of Individual Defendants, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to her under this law, including, but not limited to, liquidated damages.

**EIGHTH CAUSE OF ACTION**
**DISCRIMINATION UNDER NYCHRL**

117.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

118.    New York City Administrative Code §8-107(1) provides that it shall be unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation, or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions, or privileges of employment."

119.    By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of the NYCHRL by, *inter alia*, denying her the equal terms and conditions of employment, discriminating against her, and subjecting her to a hostile work environment because of her race (Asian) and national origin (Filipino).

98.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission, and other compensation that her employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

99.     Accordingly, as a result of the unlawful conduct of Defendants set forth herein, Plaintiff has been damaged and is entitled to the maximum compensation available to her under this law, including, but not limited to, liquidated damages.

## NINTH CAUSE OF ACTION
## RETALIATION UNDER NYCHRL

120.     Plaintiff hereby repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

121.     New York City Administrative Code §8-107(7) provides that it shall be unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, (v) requested a reasonable accommodation under this chapter, or ([v]vi) provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8-115 of this chapter.

91.     By the actions detailed above, among others, Defendants have retaliated against Plaintiff based on her protected activities in violation of the NYCHRL, including by subjecting her to baseless negative performance review, PIP, denying her the ability to transfer to a different group within the Company, and by terminating Plaintiff's employment.

92.     As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission, and other compensation that

her employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

93.     Accordingly, as a result of the unlawful conduct of Defendants set forth herein, Plaintiff has been damaged and is entitled to the maximum compensation available to her under this law, including, but not limited to, liquidated damages.

## TENTH CAUSE OF ACTION
## AIDING AND ABETTING UNDER NYCHRL

91.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

92.     New York City Administrative Code §8-107(6) provides that it shall be unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any acts of the acts forbidden under this chapter, or attempt to do so."

93.     Individual Defendants engaged in an unlawful employment practice in violation of New York City Administrative Code §8-107(6) by aiding, abetting, inciting, compelling, or coercing the discriminatory conduct against Plaintiff.

94.     As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission, and other compensation that her employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

95.    Accordingly, as a result of the unlawful conduct of Individual Defendants, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A.    Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII of the Civil Rights Act of 1964, as codified, 42 USC §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166 ("Title VII"); Section 1981 of the Civil Rights Act of 1866, 42 USC § 1981 ("§ 1981"); the New York State Human Rights Law, New York State Executive Law, §§ 296 et seq. ("NYSHRL"); the New York City Human Rights Law, Administrative Code §§ 8-107, et seq. ("NYCHRL") in that Defendants discriminated and retaliated against Plaintiff on the basis of her race (Asian) and national origin (Filipino);

B.    Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C.    Awarding Plaintiff compensatory damages for mental, emotional, and physical injury, distress, pain and suffering, and injury to her reputation in an amount to be proven at trial;

D.    Awarding Plaintiff punitive damages;

E.    Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of this action; and

F.    Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy Defendants' unlawful employment practices.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: August 3, 2023
      White Plains, New York           Respectfully submitted,

                                       **FILIPPATOS PLLC**

By: _____
Tanvir H. Rahman
199 Main Street, Suite 800
White Plains, New York 10022
T. F: 914. 984.1111
trahman@filippatoslaw.com
*Attorney for Plaintiff*